## Case No. 4,080.

DREW et al. v. POPE et al.

[2 Sawy. 72.][1]

District Court, D. California. Oct. 20, 1871.

SEAMEN PAID OUT OF PROCEEDS OF WRECKED VESSEL—PAYMENT OF EXTRA WAGES TO CONSUL.

1. The rule of the maritime law, as declared by Mr. Justice Ware. that the seaman is entitled. in cases of wreck. or semi-naufragium, to be paid out of the savings of a wreck. or the proceeds of a condemned vessel. not only his

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

wages, but an additional amount equal to the expenses of his return home, are superseded by the special laws on the subject enacted by congress.

[Cited in Kelly v. Otis, 23 Fed. 905.]

2. When a vessel had been condemned and sold, as not worth repairing; and the master, at the instance of the consul, paid to the latter the three months' extra wages required by law to be paid to him, when a vessel is voluntarily sold; which wages the men failed to receive, or apply for; *held*, that the payment of the extra wages to the consul, discharged the owner's liability therefor; but that the master had no right to deduct from the amounts due the men, a charge for exchange.

[This was a libel by George Drew and others against Pope and Talbolt to recover wages as seamen.]

D. T. Sullivan, for libellants.

Milton Andros, for respondents.

HOFFMAN, District Judge. The libellants in this case were shipped as seamen on board the ship Guiding Star, for a voyage from this port to Hongkong and back. The outward voyage was duly performed, and the return voyage commenced. Shortly after leaving Hongkong, the vessel encountered a typhoon, from which she sustained such injuries, as, in the judgment of the master, to compel her return to Hongkong. On her arrival at Hongkong, a survey was held upon her, and she was found to be in such a condition, as to render it inexpedient to repair her. It was thereupon determined to sell her, and the men were discharged. The vessel was subsequently sold for $5,700.

It is claimed on the part of the libellants that they were entitled, under these circumstances, to receive their wages up to the time of their discharge, together with a further sum sufficient to cover the expenses of their return. The respondents contend that the return voyage having been broken up by perils of the seas, and no freight having been earned thereon, the men were entitled to receive only their wages for the outward voyage, and during one half of the time the vessel lay at the outward port of delivery; and that more than this amount is admitted to have been paid to them.

The right of mariners to be compensated out of the savings of a wreck, which they have assisted in preserving, is recognized by all the authorities on maritime law. Whether this compensation is to be deemed wages earned under their contract, and payable, because the case of shipwreck constitutes an exception to the general rule, that no wages are due where no freight is earned; or, whether the contract is to be regarded as a mere salvage compensation, has been much debated in the courts. The weight of authority is perhaps in favor of the former view. The point is not ordinarily of much practical importance; for it is admitted, by those who maintain that the compensation is in the nature of salvage, that the amount to be paid is merely the wages due; so that, whether it

be termed "wages," or "wages in the nature of salvage," is often, as observed by the editor of the 8th edition of Kent's Commentaries, a question of verbal discussion and criticism rather than of a substantial distinction.

In The Two Catherines [Case No. 14,288], Judge Story put the claim of the seamen to wages in case of shipwreck, on the ground of a qualified salvage allowance, but he observes, in a note to the 6th edition of Abbott on Shipping (page 753), that the court intimated that it ought to be put on the ground of an exception to the rule, that no wages are due where no freight is earned; but he did not then think that the rule, upon the authorities had been so construed. In the subsequent case of The Neptune, 1 Hagg. Adm. 227, Lord Stowell, in an elaborate and admirable judgment, allowed seamen their wages, as such, out of the savings of a wreck, recognizing their claim as a distinct exception to the general rule. See Curt. Merch. Seam. 285-290; The Massasoit [Case No. 9,-260]. "That there may be, in the infinite range of human possibilities that may happen in the intercourse of men, circumstances which might induce the court to open itself to their claim as salvors," was admitted by Lord Stowell in The Neptune, supra, and Judge Story in The Two Catherines [supra], observes, "In my judgment there is not any principle of law which authorizes the position, that the character of seamen creates an incapacity to assume the character of salvors." But it is evident that the cases referred to by these great judges, as of possible occurrence, are rare and exceptional, and where the seaman, by some extraordinary exertions or signal display of gallantry and energy, may justly be deemed to have performed services beyond those to which his contract and his duty bound him, and which, therefore, entitle him to an additional recompense. But, as observed by Lord Stowell, "those circumstances must be very extraordinary indeed, for it is the stipulated duty of the crew (to be compensated by wages) to protect the ship through all perils, and their entire possible service for this purpose is pledged to that extent." The Neptune, supra.

In the case of The Dawn [Case No. 3,666] it was held by Mr. J. Ware, after an elaborate examination of the provisions of the ancient laws of the sea, that the maritime law on principles of public policy allows, in case of shipwreck, an extra reward beyond their wages, and in the nature of salvage to seamen according to their merit, against the property saved, which ought not to be less than the expenses of their return home. The case in which this judgment was rendered, was, in all respects, similar to the case at bar. The vessel was compelled by sea perils to seek a harbor of refuge, where, after a survey, she was condemned and sold as a wreck. No extraordinary exertions on the part of the crew beyond the line of their ordinary duty were

shown, and the decision recognises the right of seamen in every case of shipwreck, or of semi-naufragium, where the vessel has been rendered unnavigable by sea perils, and condemned and sold, to a salvage remuneration in addition to their wages, at least equal to the expenses of their return home, unless they have forfeited the right by their misconduct. At the time this decision was rendered, the act of August 18, 1856, had not been passed. By that. act it is expressly provided, that in cases of wrecked, or stranded vessels, or vessels condemned and sold as unfit for service, no payment of extra wages shall be required. [11 Stat. 62.] In this act, and the act of 1840, to which it is an amendment, the attention of congress was specially directed to the subject of securing to seamen discharged abroad the means of returning to their homes. Upon the sale abroad, of any vessel not rendered necessary by superior force, damage by tempest, or other casualty, the master is required to deposit with the consul three months' extra pay, two thirds thereof to be paid to the seamen upon his engagement on board any vessel to return to the United States, and the other third to be retained by the consul as a fund. &c.

It may therefore be justly concluded that congress, in this class of cases, intended to exempt the master from the duty of providing means for the return of the seamen; and, if so, the provision in question must be taken as repealing or superseding the rule of the maritime law, as declared by Mr. Justice Ware, even if such a rule had theretofore been recognised and established in our jurisprudence. The point, however, is not material to the present case; for the master has paid to the consul the whole amount of extra wages, which would have been required of him, if the vessel had been voluntarily sold. The men declare that they have not received them; but they do not appear to have demanded them of the consul; and, even if they had done so, and payment had been refused, the default of the consul would not have rendered the master liable to pay them a second time. That the payment was properly made to the consul, and not to the men, is clear from the explicit language of the law, and from the provisions of the act of 1840 [5 Stat. 394] which require that the two-thirds belonging to the men shall be paid them by the consul only, upon their engagement on board of a vessel to return to the United States, and from those of the act of 1856 [11 Stat. 62] which require the consul to pay out of the seamen's share of extra wages any expenses he may have incurred for board or necessaries, after his discharge, and direct him to retain a sufficient sum for the purpose, paying over to the seamen only the balance. It may be objected that this payment was a nullity, because no extra wages were required to be paid by the act of congress, and the claim of the seamen, under

the maritime law, cannot be satisfied by a payment to the consul. But they claimed extra wages, and their claim was allowed by the consul, and paid by the master; they cannot now be heard to say that their claim was a different one, and such as could only be satisfied by a direct payment to themselves. Moreover, the master had a right to waive the exception of the law in favor of stranded and condemned vessels, to treat the sale as a voluntary one, and fulfill all the obligations imposed on masters, in cases of voluntary sales.

It is contended by the advocate for the libellants, that the proof of unnavigability of the vessel are insufficient; that the report of the surveyors is inadmissible to prove the truth of the statements it contains. and that it does not satisfactorily appear that the vessel might not have been repaired. and resumed her voyage within a reasonable time. Assuming these positions to be well taken, the result is that the sale must be considered a voluntary one, and the consul was right in exacting, and the master in paying to him, the three months' extra wages required by law; upon doing which, the master was relieved from further liability. The evidence of the payment of the extra wages consists of the master's positive testimony to that effect, corroborated by the deposition of the vice-consul, or consul's clerk, who swears that he has every reason to believe the fact, though he did not see the payment actually made. The master also produces a receipt for the wages, signed by the consul. The men admit that, after receiving their wages earned, they made no subsequent application to the consul for extra wages deposited with him. The payment, therefore, of these wages to the consul by the master must be taken as fully proved.

It is further contended, on the part of the men, that the amounts paid them were less than the wages earned up to the time of their discharge. In support of this allegation, they produce certain slips of paper, upon which the amounts due them are marked, and which they say was all they received. Mr. Nickerson, however, states that these slips were handed to the men before their accounts were made up, merely as an approximate statement of the sums due them, and to be exhibited to the boarding-house keepers by the men, to enable them to obtain credit for board and lodging. That the accounts were accurately made up on the succeeding day, and the full amounts due the men, as shown by the captain's books, were paid them in the consul's office, the men signing a receipt therefor. This receipt is produced and sworn to by the master. It is also identified by Mr. Nickerson, who testifies that it was signed by the men in his presence; and that the sums therein mentioned were paid them, less only the difference in exchange. or cost of procuring American money, and a sum deposited with the

,boarding-house keepers as security for·board, ·with the assent of the men, and in accord- ·ance with the custom of the place. This evi- dence is, I think, sufficient to establish that ·the men received the sums receipted for by them, less only the deductions above men- tioned. But I cannot perceive by what right the master deducted from their wages the expense he was put to, in obtaining the funds to pay them. If he had contracted with them to pay a certain sum in American gold coin, in China, it would have been clearly his duty to fulfill his contract according to its terms, and to provide, at his own expense, the means for doing so. In this case, the law imposed on him the duty of paying a certain sum of money; that duty arose upon the happening of a contingency, which he was bound to provide for. He has no more right to say that the fulfillment of this duty was expensive to him, and that expense must be borne by the men, than any merchant who had contracted to deliver a similar sum in American coin at a foreign port, would have, to charge the person with whom he had contracted, the expense incurred in ob- taining it. I think that the amount so de- ducted must be paid to the men. The sum is insignificant, and the deduction was prob- ably made by the master under a misconcep- tion of his rights. A decree for the amount charged for exchange, to be settled before a commissioner, if the parties are unable to agree, but without costs, must be entered.

---

DREW (SMITH v.). See Case No. 13,038.

DREW (UNITED STATES v.). See Case No. 14,993.

DREW (WESTERN DIVISION OF WEST- ERN N. C. R. CO. v.). See Cases Nos. 17,433 and 17,434.

DREW, The DANIEL. See Case No. 3,565.