KELLY and others *v.* OTIS.[1]

(*Circuit Court, E. D. Louisiana.* January 30, 1885.)

SEAMEN'S WAGES—REV. ST. §§ 4577-4586.

The general maritime law, which, in a case of *seminaufragium,* or where the vessel was condemned and sold as too unseaworthy to be repaired, gave discharged seamen passage home and wages up to the time of reaching home, is modified by the statutes of the United States which provide for all cases of discharge of seamen in foreign ports, and, in case of destitute seamen, their return home, by the consular agents of the United States, at the expense of a fund derived from the one-third of the three months' extra wages collected by the consuls or agents from all American ships discharging seamen in foreign ports, except where ships are stranded or wrecked, or condemned as unfit for service. See sections 4577-4586, Rev. St.

Admiralty Appeal.

*R. King Cutler* and *E. D. Craig,* for libelants.

*W. S. Benedict* and *Ambrose Smith,* for defendant.

PARDEE, J. About December, 1882, the schooner John G. Whipple, of which the succession of Peter A. Fronty was the owner, and of which Henry Otis was the mortgagee in possession and control, sailed from this port for the port of Minatitlan, Mexico, with a cargo of lumber. With more or less trouble from leaking the voyage was made in safety, and the cargo delivered. A return cargo of mahogany timber was loaded, consigned to said Otis, and, on the 14th day of February, 1883, the said schooner sailed from said port of Minatitlan for the port of New Orleans. At the time of sailing, according to the sworn protest of the master, mate, and carpenter,—the two latter being libelants herein,—the said schooner was tight, staunch, and strong; had her cargo well and sufficiently stowed and secured; had her hatches well calked and covered; and was well and sufficiently manned, etc. On the sixteenth of February she encountered heavy head seas and storms, which so distressed her through laboring and leaking that the master, on consultation with his officers and crew, abandoned the voyage and turned back to the port of departure, which was safely reached on the seventeenth day of February. On the 17th the master appeared before the American consul and made protest, which on the 20th was extended, and was signed and sworn to by the master, mate, and carpenter. On the same day, on application of the master, the consul ordered a survey, which resulted in recommending the forthwith discharge of the cargo to ascertain the cause and extent of the leaks. After the discharge of cargo, on the first of March, the consul ordered another survey, which, on March 3d, resulted in finding as follows:

"We find five planks on each side started from her transom, main boom broken, her jib-stay parted, the after-port chain-plate broken, and the bolts loose; her seams from light-water mark to plankshire and wood ends open, causing great leaks; her water-way seams we find very much open, and there is no doubt that the seams sprung open in the sea-way, causing her to leak

1 Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

badly; that the said vessel is badly strained and unfit for sea in her present condition, and in dilapidated condition, which would necessitate a repair, which in this port could not be had, but at an exorbitant expense which would far exceed her value when completed."

On this finding the schooner was advertised and sold, the sale taking place on March 7th, under the authority of the consul. March 8th the crew were paid off in full and discharged by the consul, but no future pay was given then, nor expense for sending them home was provided. The entire crew returned to this port at their own expense, and have brought their libel against Otis as owner, each for three months' advance pay, for $25 expense of passage home, and for $10 expense of board in foreign port while waiting to get passage home. In the district court their demand was rejected, because the evidence showed a condemnation and sale of the schooner within the provisions of section 4583 of the Revised Statutes of the United States, in which case no damage in the nature of extra wages or for expenses or passage money is recoverable under the law. In this court the right to recover is claimed, notwithstanding the sale and condemnation under article 4583, because the schooner was unseaworthy when she sailed from the port of New Orleans, within the knowledge of Otis, as owner, and unknown to libelants, from whom it was concealed.

The evidence in the record does not satisfactorily show that the schooner was unseaworthy when she sailed from the port of New Orleans on the voyage to Minatitlan; and such fact of unseaworthiness is entirely inconsistent with the fact that the voyage was made in safety, with the sworn protest of February 20th of two of the libelants, and with the additional fact that at Minatitlan no complaint was made by any of the crew, under section 4559 of the Revised Statutes, which provides for a survey in case of unseaworthiness in a foreign port. But, considering the fact that the schooner was old and decayed, and leaked a good deal on the voyage to Minatitlan, and was found to be dilapidated by the board of survey after her return from the attempted voyage from Minatitlan to New Orleans, I am disposed to think that she was unseaworthy when she left New Orleans. The evidence, however, entirely fails to show that Otis, the alleged owner, but really the mortgagee in possession, had any knowledge of her unseaworthiness or acted with bad faith in any respect. The libelants cannot, therefore, recover from him on any such ground. In fact, in no aspect of the case made by the evidence can I see that libelants can recover against the respondent.

Section 4583, to the effect that "no payment of extra wages shall be required upon the discharge of any seaman in cases where vessels are wrecked or stranded, or condemned as unfit for service," makes no exception in terms, and, unless we can have a case where a ship shall be condemned as unfit for service, and yet be seaworthy, it would seem to be difficult to imply or infer an exception. It would seem that no statutory right to three months' wages can exist in any

case of discharge of seamen in a foreign port, where the vessel is condemned as unfit for service. The three months' extra wages under the statute are clearly intended to be in lieu of expenses and passage money, to enable the discharged seamen to return home.

The general maritime law which, in a case of *seminaufragium*, or where the vessel was condemned and sold as too unseaworthy to be repaired, gave discharged seamen passage home, and wages up to the time of reaching home, is unquestionably affected and modified by the statutes of the United States, which provide for all cases of discharge of seamen in foreign ports, and, in case of destitute seamen, their return home by the consular agents of the United States at the expense of a fund derived from the one-third of the three months' extra wages, collected by the consul or agents from all American ships discharging seamen in foreign ports, except where ships are stranded or wrecked, or condemned as unfit for service. See sections 4577–4586, inclusive, of the Revised Statutes of the United States.

Before the statute of 1856, (11 St. at Large, 62,) where the provision, "that in cases of wrecked or stranded ships or vessels, or where vessels are condemned as unfit for service, no payment of extra wages shall be required," first appears in the laws of the United States, courts of admiralty usually followed the case of *The Dawn*, where Judge WARE, in a case like the present, denied the three months' extra wages, but allowed a sum in addition to wages sufficient to defray expenses of returning home, to be paid out of the proceeds of the sale of the vessel, (see Davies, 121, and Fland. Mar. Law, § 473;) but since the act of 1856 the cases generally deny, when the ship was condemned and unfit, both extra wages and expenses home. See *Hoffman* v. *Yarrington*, 1 Low. 168; *Drew* v. *Pope*, 2 Sawy. 72; *Gallagher* v. *Murray*, 10 Ben. 290.

In *Henop* v. *Tucker*, 2 Paine, 151, and perhaps other cases decided before the act of 1856, it is intimated that the extra wages stand upon a different footing if the ship were started on her voyage in an unseaworthy condition, and that in such case they might be recovered. While I am not disposed to concede that in any case where the ship is condemned in a foreign port as unfit for sea service, that the extra three months' wages can be recovered, I am of the opinion that, in case of fraud or bad faith on the part of the owner, a seaman discharged improperly or prematurely may recover all the damages suffered by reason of such discharge.

Entertaining these views of this case, it follows that the extra wages demanded must be refused, because the schooner was condemned in a foreign port as unfit for sea service, and the demand for expenses in returning home incurred by libelants must be rejected because no fraud nor bad faith existed on the part of Otis, considering him as the responsible owner.

Let a decree be entered affirming the decree rendered in the district court in this case, with costs against libelants.